IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 07-cv-02584-REB-BNB

ABEER FARAGALLA

Plaintiff,

v.

DOUGLAS COUNTY SCHOOL DISTRICT RE1 "DCSD,"
CEREBRAL PALSY OF COLORADO "CP,"
DOUGLAS COUNTY EDUCATION FOUNDATION, and
DOUGLAS COUNTY SCHOOL DISTRICT BOARD OF EDUCATION "BOE,"

Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

This matter arises on **Defendant DCSD's Motion for Summary Judgment** [Doc. #157, filed 01/23/2009] (the "Motion") submitted on behalf of defendant Douglas County School District ("DCSD") and Douglas County School Board of Education (the "Board of Education"). I respectfully RECOMMEND that the Motion be GRANTED.

## I.  STANDARD OF REVIEW

The plaintiff is proceeding *pro se*, and I must liberally construe her pleadings.  Haines v. Kerner, 404 U.S. 519, 520-21 (1972).  Nevertheless, I cannot act as advocate for a *pro se* litigant, who must comply with the fundamental requirements of the Federal Rules of Civil Procedure. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the party opposing the motion and that party must be afforded the benefit of all reasonable inferences to be drawn from the evidence.  Adickes v. S. H. Kress & Co., 398 U.S.

144, 157 (1970).  Rule 56(c), Fed. R. Civ. P., provides that summary judgment should be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, discovery and disclosure materials on file, and any affidavits, the absence of genuine issues of material fact.  Celotex Corp. v. Catrett, 447 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir. 2002).  The party opposing the motion is then required to go beyond the pleadings and designate evidence of specific facts showing that there is a genuine issue for trial.  Celotex, 447 U.S. at 324.

Only admissible evidence may be considered when ruling on a motion for summary judgment.  World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985).  Affidavits must be based on personal knowledge and must set forth facts that would be admissible in evidence.  Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and citation omitted).  "Conclusory and self-serving affidavits are not sufficient."  Id.

## II.   UNDISPUTED MATERIAL FACTS[1]

1.   The plaintiff was hired by DCSD as an Educational Assistant ("EA") for Students with Special Needs ("SSN") at the Iron Horse Elementary School on August 16, 2005. *Complaint*, ¶ 13.

2.   In February 2006, the plaintiff received a performance evaluation that rated her as "Meets Expectations" with some specific comments regarding areas of expected improvement. *Motion*, Ex. A, ¶ 2 and Ex. A-1; *Complaint*, ¶ 28.  The evaluation identified goals for the plaintiff which included "developing a positive relationship with her coworkers"; "realize that interruptions and changes of plans always occur"; and "follow through with [] additional requests" made by her supervisors.   *Motion*, Ex. A, ¶ 2 and Ex. A-1.

3.   The following year, the plaintiff's workload increased when administrators assigned her to work with more than one special-needs student.  *Complaint*, ¶ 26.

4.   In the fall of 2006, the plaintiff began reporting to a new immediate supervisor, Tanya Pennington, a Special Education Teacher.  Id. at ¶ 19.  From November 2006 through April 2007, Pennington documented concerns she had with the plaintiff's work.  *Motion*, Ex. B, ¶ 4a and Ex. B-1.

5.   On December 5, 2006, the plaintiff attended a meeting with Pennington and Steve Getchell, Principal of Iron Horse Elementary School, concerning an incident with a student. *Complaint*, ¶ 19.  After that meeting, the plaintiff had many meetings with her supervisors concerning her job performance.  Id. at ¶ 20.

---

[1]The plaintiff did not address the defendants' Statement of Undisputed Facts.  *Plaintiff's Second Revised Response to DCSD's Summary Judgment Motion* [Doc. #266].

6.   On February 16, 2007, the plaintiff had a dispute with Sandra (Sam) Gates, also an EA at Iron Horse Elementary School. *Motion*, Ex. A, ¶ 6.

7.   On February 16, 2007, the plaintiff complained to Assistant Principal Kathy Nelson "of harassment and of being subject to different terms of employment." *Complaint*, ¶ 30. Nelson investigated the plaintiff's claim and found it was unsubstantiated. Id.  On March 9, 2007, the plaintiff received a memo regarding the results of the investigation of the dispute with Sandra Gates. *Motion*, Ex. B, ¶ 4e and Ex. B-5, p. 1, second paragraph.

8.   On February 22, 2007, the plaintiff was placed on a performance improvement plan that identified specific performance concerns and established goals. *Complaint*, ¶ 20.

9.   Between February and April 2007, the plaintiff received three written directives from her supervisors for three separate work performance concerns. *Motion*, Ex. A, ¶ 5 and Ex. A-3.

10.   The plaintiff contacted Debbie McGee, Human Resources Director, on April 2, 2007, claiming that she was discriminated against and harassed by staff at Iron Horse Elementary School. Id. at Ex. B, ¶ 2.  McGee investigated the complaint and found no evidence of discrimination or harassment. Id. at ¶ 4, 6.  McGee communicated the results of her investigation to the plaintiff by letter dated May 7, 2007. Id. at ¶ 7 and Ex. B-7.

11.   After the meeting with McGee, the plaintiff appealed her complaint to Superintendent Jim Christensen. *Complaint*, ¶ 31.  He reviewed the matter and agreed with McGee's findings. *Motion*, Ex. D.

12.   Mr. Getchell recommended the termination of the plaintiff's employment to the Superintendent and the Board of Education. Id. at Ex. A, ¶¶ 9-10.  The recommendation was

shared with the plaintiff verbally and in writing on May 11, 2007. Id. at ¶ 11 and Ex. A-7. The

Board of Education acted on the recommendation on June 5, 2007. Id. at ¶ 12.

13.   In May 2007, the plaintiff filed a claim with the Equal Employment Opportunity

Commission ("EEOC") alleging discrimination based on national origin (Egyptian), religion, and

retaliation. *Plaintiff's Second Revised Response to DCSD's Summary Judgment Motion* [Doc.

#266] (the "Response"), Ex. 45, p. 4.

14.   Prior to July 2007, Getchell was not aware that the plaintiff had filed a claim for

discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Motion*, Ex. A,

¶ 13.

15.   The plaintiff requested a Level III grievance hearing on her termination. *Complaint*,

¶ 31.  The plaintiff met with Bill Hodges, Assistant Superintendent of Human Resources, on

June 14, 2007. *Motion*, Ex. E.  Hodges investigated the plaintiff's allegations and denied her

claim. Id.  He informed the plaintiff that under the Classified Contract, she could pursue a Level

IV arbitration hearing by requesting that the Douglas County Federation for Classified

Employees (the "Union") file on her behalf. Id.  He further informed the plaintiff that the

decision as to whether to file a Level IV arbitration hearing lies solely with the Union. Id.

16.   The plaintiff requested a Level IV appeal.  The Union chose not to pursue a Level IV

grievance because it determined her grievance was weak. Id. at Ex. F, ¶¶ 2-3.

17.   The plaintiff filed a second EEOC charge against DCSD in September 2007,

claiming retaliation and discrimination based on her national origin and religion. *Response*, Ex.

45, p. 3.

The plaintiff filed her Third Amended Title VII Complaint [Doc. #59] (the "Complaint") on May 22, 2008.  The allegations of the Complaint are not verified, are disjointed, and are redundant.  The Complaint contains twelve claims.  Claims One through Ten are asserted against defendant DCSD.  Claim Twelve is asserted against defendant Board of Education.  These claims may be summarized as follows:

1.   Claim One alleges that DCSD subjected the plaintiff to a hostile work environment in violation of 42 U.S.C. 2000e ("Title VII") and 42 U.S.C. § 1981, and alleges state law torts of intentional infliction of emotional distress, gross negligence, and reckless endangerment. *Complaint*, p. 4.[2]

2.   Claim Two alleges that in violation of Title VII and section 1981, DCSD retaliated against the plaintiff for her "participation in protected and nonprotected activities" and her "opposition to DCSD's unlawful practices" by subjecting her to different terms and conditions of employment; discharging her; assigning her a heavier workload and unusual duties; subjecting her to a hostile work environment; giving her a negative performance evaluation; and denying her "due process rights to grievance."  Id. at p. 5.

3.   Claim Three alleges that DCSD discriminated against the plaintiff by denying her job opportunities in violation of Title VII and section 1981.  Id. at p. 6.

4.   Claim Four alleges that DCSD discriminated against the plaintiff when it subjected her to different terms and conditions of employment in violation of Title VII and section 1981. Id. at pp. 6-7.

---

[2]The Complaint is not consecutively paginated.  Therefore, I cite to the page numbers as they are assigned by the court's docketing system on May 22, 2008.

5.   Claim Five alleges that DCSD discriminated and retaliated against the plaintiff by giving her a negative performance evaluation despite her exceptional performance in violation of Title VII and section 1981.  Id. at p. 7.

6.   Claim Six alleges that DCSD discriminated and retaliated against the plaintiff when it denied her "due process to grievance" in violation of Title VII and 42 U.S.C. §§ 1981 and 1983. Id. at p. 7.

7.   Claim Seven alleges that DCSD discharged the plaintiff in violation of Title VII; section 1981; the Fourteenth Amendment; the Colorado Constitution; the state law torts of breach of duty of fair dealing, wrongful discharge, and intentional infliction of emotional distress; the Fair Labor Practices Act; the Colorado Labor Relation Act; and the Colorado Labor Peace Act.  Id. at p. 8.

8.   Claim Eight alleges that DCSD committed the torts of intentional infliction of emotional distress and civil battery based on all of its unlawful practices as listed in the Complaint.  Id. at p. 9.

9.   Claim Nine alleges that DCSD discriminated against the plaintiff when it refused to compensate her for the additional duties and heavier work load assigned to her as of June 2005, in violation of Title VII and section 1981.  Id.

10.   Claim Ten alleges that DCSD retaliated against the plaintiff when it provided negative references to prospective employers in violation of 42 U.S.C. § 2000e ("Title VII"); section 1981; and the state law torts of defamation and intentional infliction of emotional distress."  Id. at pp. 9-10.

12.   Claim Twelve alleges that the defendant Board of Education endorsed the plaintiff's termination without due process in violation of Title VII; 42 U.S.C. § 1981; the Fifth Amendment; the Fourteenth Amendment; 42 U.S.C. § 1983; and the state law torts of intentional infliction of emotional distress, defamation, wrongful discharge, gross negligence, "reckless disregard to protected rights of others," reckless endangerment, and "unfair labor dealing."[3]

The plaintiff seeks compensatory damages in the amounts of $900,000.00 from DCSD and $600,000.00 from the Board of Education, as well as front pay and back pay, and punitive damages in the amounts of "at least" $950,000.00 from DCSD and $650,000.00 from the Board of Education.  Id. at p. 13.

## III.  ANALYSIS

### A.  Tort Claims

The plaintiff alleges within her claims against DCSD and the Board of Education the following state law tort claims: intentional infliction of emotional distress; gross negligence; reckless endangerment; breach of the duty of fair dealing; wrongful discharge; civil battery; and defamation.  The defendants assert that there is no subject matter jurisdiction over the plaintiff's tort claims because they are barred by the Colorado Governmental Immunity Act ("CGIA"). *Motion*, pp. 6-7.  The plaintiff has the burden to prove jurisdiction in the face of a challenge under Rule 12(b)(1), Fed. R. Civ. P.  Trinity Broadcasting of Denver, Inc., v. City of Westminster, 848 P.2d 916, 925 (Colo. 1993).

---

[3]To the extent the plaintiff attempts to bring other claims, those claims are unintelligible and will not be recognized.  See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) (stating that "[t]he broad reading of the plaintiff's complaint does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based").

The CGIA, section 24-10-101 *et seq.*, C.R.S., sets forth the circumstances under which a plaintiff may bring an action in tort against the state, its political subdivisions, and its employees. Mesa County Valley School District v. Kelsey, 8 P.3d 1200, 1203 (Colo. 2000).  The CGIA provides, in pertinent part:

> A public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort . . . except as provided otherwise in this section.

§ 24-10-106(1), C.R.S.

The CGIA defines the term "public entity" as follows:

> "Public entity" means the state, county, city and county, municipality, school district, special improvement district, and every other kind of district, agency, instrumentality, or political subdivision thereof organized pursuant to law and any separate entity created by intergovernmental contract or cooperation only between or among the state, county, city and county, municipality, school district, special improvement district, and every other kind of district, agency, instrumentality, or political subdivision thereof.

§ 24-10-103(5), C.R.S.

The plaintiff does not dispute that DCSD and the Board of Education are public entities or that her claims lie in tort or could lie in tort. *Response*, p. 18.  Therefore, absent an exception to immunity, the defendants are entitled to summary judgment on the plaintiff's state law tort claims.

The plaintiff asserts that the defendants have waived their immunity because they "violated the purpose of [their] existence, and her injury is related to that purpose." Id.  This is not one of the enumerated exceptions to immunity, however.  § 24-10-106, C.R.S.  Accordingly, I respectfully RECOMMEND that the Motion be GRANTED insofar as it seeks dismissal of the plaintiff's state law tort claims for lack of subject matter jurisdiction.

## B.   Labor Claims

Claim Seven alleges that DCSD discharged the plaintiff in violation of the Fair Labor Practices Act; the Colorado Labor Relation Act; and the Colorado Labor Peace Act.  *Complaint*, p. 8.  The defendants assert that the plaintiff's claims based on labor law fail to state a claim for relief.  *Motion*, p. 7.

The plaintiff does not provide citations to these acts.  My independent research has failed to disclose a Fair Labor Practices Act or Colorado Labor Relation Act.

The Colorado Labor Peace Act, §§ 8-3-101 to 123, C.R.S., "is a comprehensive statute regulating the conduct of parties to a labor dispute."  City of Golden v. Ford, 348 P.2d 951, 952 (Colo. 1960).  The Act specifically excludes as employers states and their political subdivisions, with exceptions not applicable in this case.  C.R.S. § 8-3-104(12).  Accordingly, the plaintiff's claim is not governed the Colorado Labor Peace Act.

I respectfully RECOMMEND that the Motion be GRANTED to the extent it seeks summary judgment on the plaintiff's claims pursuant to the Fair Labor Practices Act; the Colorado Labor Relation Act; and the Colorado Labor Peace Act.

## C.   Claims Pursuant to the United States Constitution

Claim Seven alleges that DCSD terminated the plaintiff's employment in violation of the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution.  *Complaint*, p. 8, ¶ 32c.  Claim Seven also alleges that "DCSD further violated 42 U.S.C.A. § 1983 in depriving me of my constitutional right."  Id.  Claim Twelve alleges that the Board of Education endorsed the plaintiff's termination without due process in violation of the Fifth and Fourteenth Amendments to the United States Constitution.  Id. at p. 11, ¶¶ 47a and c.  Claim

Twelve also alleges that the Board of Education "further violated 42 U.S.C.A. § 1983 in

depriving me of my constitutional rights and acting with reckless disregard to such rights." Id. at

p. 12, ¶47c.

As a preliminary matter, section 1983 is a remedial statute, and it does not create any

substantive rights. Tafoya v. Adams, 816 F.2d 555, 558 n.5 (10th Cir. 1987). Section 1983

"creates only a remedy for violations of rights secured by a federal statutory and constitutional

laws." Id. Therefore, although the plaintiff may assert her constitutional claims via section

1983, section 1983 does not create a separate cause of action.

The due process clause prohibits the government from depriving a person of life, liberty,

or property without prior notice and an opportunity for a hearing. Cleveland Board of Education

v. Loudermill, 470 U.S. 532, 542 (1985). "To invoke the protections of procedural due process,

a plaintiff must establish the existence of a recognized property or liberty interest." Setliff v.

Memorial Hosp. of Sheridan County, 850 F.2d 1384, 1394 (10th Cir. 1988) (citing Board of

Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972)).

"Property interests are not created by the Constitution, they are created and their

dimensions are defined by existing rules or understandings that stem from an independent source

such as state law." Loudermill, 470 U.S. at 538 (internal quotations and citation omitted). "The

hallmark of property, the [Supreme] Court has emphasized, is an individual entitlement

grounded in state law, which cannot be removed except for cause." Setliff, 850 F.2d at 1395

(internal quotations and citations omitted).

The plaintiff claims a property right in her professional reputation and in her continued

employment with DCSD. *Complaint*, p. 8, ¶32c; p. 11, ¶ 47c.

11

"[I]njury to one's reputation alone, apart from some more tangible interests such as employment, is not subject to the requirements of due process." Setliff, 850 F.2d at 1396 (internal quotations and citations omitted).  Thus, the plaintiff does not have a property right in her professional reputation.

With regard to the plaintiff's claim that she has a property interest in her continued employment with DCSD, she must base this claim on some substantive restriction on DCSD's discretion to terminate her employment.  However, the Complaint contains only conclusory and unverified allegations that the plaintiff has a liberty interest in her continued employment, and the plaintiff does not provide any comprehensible argument or competent evidence to support her claim of a liberty interest. *Response*, p. 18 and Ex. 42.

I respectfully RECOMMEND that the Motion be GRANTED insofar as it seeks summary judgment in favor of DCSD and the Board of Education on the plaintiff's claims that they violated her due process rights under the United States Constitution.

### D.   Claims Pursuant to the Colorado Constitution

Claim Seven alleges that DCSD terminated the plaintiff's employment in violation of the Colorado Constitution's due process clause. *Complaint*, p. 8, ¶ 32d.  The plaintiff is asserting Claim Seven pursuant to both the Colorado Constitution and the United States Constitution.  The plaintiff does not have an implied cause of action under the Colorado Constitution. Bd. of County Comm'rs v. Sundheim, 926 P.2d 545, 553 (Colo. 1996) (stating that creation of implied cause of action under the Colorado Constitution is unnecessary where remedy is available under 42 U.S.C. § 1983).  Accordingly, I respectfully RECOMMEND that the Motion be GRANTED

to the extent it seeks summary judgment on the plaintiff's claims pursuant to the Colorado Constitution.

### E.   Retaliation Claims

The plaintiff's Response and attached affidavit--like the Complaint--contain a tedious and unfocused recitation of wrongs allegedly suffered by the plaintiff at the hands of DCSD. Many of the allegations are vague and conclusory; they do not specify the individuals involved, the context of the event, or the time the alleged action was taken.  It is not a judicial function to search the record for evidence supporting a plaintiff's claims.  See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1546 (10th Cir. 1995).  Rather, it is the litigants' responsibility to provide the court with concise arguments, relevant facts, and specific citations to authorities and supporting evidence.  Toth v. Gates Rubber Co., 2000 WL 796068, *8 (10th Cir. 2000). Nevertheless, in an attempt to thoroughly analyze the plaintiff's claims, I have painstakingly examined the record to ascertain if it contains any evidence of discrimination.

As for the plaintiff's retaliation claims, she prefaces all of her Title VII claims with the phrase "intentionally discriminated against me because of my race, national origin, and religion, because of my participation in  protected and non-protected activities and because of my lawful opposition to DCSD's unlawful employment practices."  Claims One, Two, Three, Four, Five, Six, Seven, Nine, and Ten contain these allegations against DCSD, and Claim Twelve contains these allegations as against the Board of Education.  That boilerplate language, without more, does not state a claim of retaliation.

Claims Two, Five, Six, and Ten contain more specific allegations which I construe as claims for retaliation.

Title VII prohibits retaliation against individuals who oppose discriminatory employment practices or participate in complaints or investigations of employment practices prohibited by Title VII.  42 U.S.C. § 2000e-3(a).  This provision applies to former employees as well as current employees.  Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997).

Section 1981 prohibits intentional race discrimination in the making and enforcement of contracts with both public and private actors.  42 U.S.C. § 1981.  The statute's protection extends to the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[4]  Id. at 1981(b).

When analyzing a retaliation claim where, as here, there is no direct evidence of retaliation, the claim is analyzed under the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  Somoza v. University of Denver, 513 F.3d 1206, 1211; Stover v. Martinez, 382 F.3d 1064, 1070 (10th Cir. 2004).  In particular:

> Following this framework, an employee must first present a prima facie case of retaliation, which then shifts the burden to the employer to produce a legitimate, nondiscriminatory justification for taking the disputed employment action.  If the employer provides a legitimate, non-discriminatory justification for the action, the burden shifts back to the employee to provide evidence showing that the employer's proffered reason is a pretext for discrimination.

Stover, 382 F.3d at 1070-71.

The plaintiff bears the burden of establishing a *prima facie* case of retaliation.  Sanchez v. Denver Public Schools, 164 F.3d 527, 533 (10th Cir. 1998).  To establish this *prima facie* case

---

[4]The defendants do not challenge the existence of an applicable contract.

under either Title VII and section 1981, a plaintiff must establish that: (1) she engaged in protected opposition to discrimination; (2) she suffered an employment action that a reasonable employee would have found materially adverse such that they might be dissuaded from making a charge of discrimination; and (3) there is a causal connection between the protected activity and the employment action.  Somoza, 513 F.3d at 1212.

Title VII establishes two categories of protected activity: when an employee "has opposed any practice made an unlawful employment practice by this subchapter" ("opposition activity") or when an employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" ("participation activity").  42 U.S.C. § 2000e-3(a).

The Tenth Circuit Court of Appeals has stated the following with regard to the causal connection requirement:

> A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.  Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation.  We have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation.  By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation.

O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1253 (10th Cir. 2001) (internal quotations and citations omitted).

### 1.  Claim Two

In Claim Two, the plaintiff alleges that after complaining "of discrimination, of

retaliation, of hostile work environment and of being subject to different terms and conditions of

employment, DCSD took a series of adverse and harmful employment actions" against her.

*Complaint*, p. 5, ¶ 18.  Specifically, the plaintiff alleges:[5]

> Pennington's first day on the job was about Mid Nov 2007.
> Between Mid to late Nov, I informally complained to Pennington
> of being demeaned and of being assigned to heavier load and
> unusual duties.  On Dec 5th, I was called to a disciplinary meeting
> for the first time since I worked with DCSD.  I was accused of
> allegedly failing to deal with a student's behavior during music
> class on Dec 1st. . . .
>
> Ever since then, my behavior was constantly misrepresented; I was
> called to disciplinary meetings almost on weekly basis.  I was
> bombarded with false accusations and fabricated performance
> deficits that were never alleged before my complaints.  Each and
> every single complaint I submitted was almost always followed
> with an adverse action within 24 hrs, as will be detailed in my
> testimony.  For example, on Feb 21st, I disputed my supervisors'
> finding on my complaint and asserted harassment charges.  The
> very next day, Feb. 22nd, an improvement plan is set for me based
> on fabricated deficits.  I filed another retaliation complaint on the
> 29th of March.  I was called to a meeting on April 2nd, was handed a
> letter dated the very next day of my complaint, March 30th, stating
> Nelson observed me in a meeting and fount that "communication
> doesn't come easy to me".  In this meeting, an EA said that she
> didn't want to work with me; I said that I want to work with her
> and invited her to explore ways we can reach for each other.
> Nelson disciplined me holding that I was "redundant" in trying to
> convince her to work with me, that they won't work with me,
> reiterated that for my "own emotional wellbeing" I need to find
> alternatives to this job.

---

[5]Quotations of the plaintiff's submissions are made without any attempt to identify or
correct errors.

> Another example: April 4 I mailed HR and the office of the
> superintendent requesting investigation into my harassment claims
> and asserting retaliatory charges against my supervisors.  On April
> 5th I was falsely accused of "placing a rope around a child's mid
> section" . . .
>
> McGee, HR investigator, threatened me that I'de be made to "look
> bad", that transfer or rehire "won't happen" and that they will
> "work harder to find performance deficits" to discharge me, if I
> continue the grievance process.  Her threats were fulfilled as I was
> fired on May 11th, 3 days after grieving her findings and HR
> investigation.   DCSD retaliatory intent can be further drawn from
> comparing my pre and post grievance evaluation and by cross-
> examining DCSD staff.  Who threatened me, such as: McGee,
> Pennington and Nelson.  DCSD further retaliated against my
> children who attend DCSD schools and used them to [relay]
> threatening and intimidating messages to me, in heartless disregard
> to my kids' disability.

Id. at ¶¶ 19-22 (emphasis deleted).

The plaintiff makes many references to "complaints" and "harassment charges."

However, not every complaint or harassment charge constitutes a protected activity within the

meaning of Title VII:

> Congress intended ADEA § 623(d) "to protect a wide range of
> activity in addition to the filing of a formal complaint."  Whitten v.
> Farmland Indus., Inc., 759 F.Supp. 1522, 1538 (D.Kan.1991).  At
> one end of the spectrum, it is well-established that an employee's
> express complaints to supervisors about perceived discriminatory
> practices constitutes protected activity.  See Lambert v. Genesee
> Hosp., 10 F.3d 46, 55 (2d Cir.1993), cert. denied, 511 U.S. 1052,
> 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); Cobb v. Anheuser Busch,
> Inc., 793 F.Supp. 1457, 1489-90 (E.D.Mo.1990).  At the other end
> of the spectrum, however, the "wide range" of protected activity
> clearly does not include those situations where the opposition
> relates not to unlawful employment practices but to a personal
> grievance.  See Allen v. Denver Pub. Sch. Bd., 928 F.2d 978, 985
> (10th Cir.1991); Aldridge v. Tougaloo College, 847 F.Supp. 480,
> 484-85 (S.D.Miss.1994) (grievance mentioned posting of job
> vacancy and instances of alleged unfair treatment); E.E.O.C. v.
> MCI Telecommunications Corp., 820 F.Supp. 300, 308

17

(S.D.Tex.1993) (concerns centered on posting of job openings); Kauffman v. Kent State Univ., 815 F.Supp. 1077, 1084-85 n. 3 (N.D.Ohio 1993) (plaintiff complained about having to do supervisor's personal work), aff'd, 21 F.3d 428 (6th Cir.1994). While some courts have indicated that vague references to unspecified discrimination are not protected, no clear rule has emerged as to the level of specificity required, and the standard employed by most courts is not exacting.  Compare Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th Cir.1989) (allegation of "ethnocism" insufficient) with Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1567-70 (2d Cir.1989) (mock memo listing age and gender qualifications for certain position permitted finding of opposition); Truskoski v. ESPN, Inc., 823 F.Supp. 1007, 1012 (D.Conn.1993) (complaints about disparate impact of staffing policy had "overtones of gender bias and discrimination").

Garcia-Paz v. Swift Textiles, Inc., 873 F. Supp. 547, 559-60 (D. Kan. 1995).

I have examined the record in an attempt to ascertain the date of the plaintiff's protected

activity.  The plaintiff first alleges that she "informally complained to Pennington of being

demeaned and of being assigned to heavier load and unusual duties."  In particular, she attests

that on November 9, 2006, she complained to Pennington that she felt "very demeaned by her

[Pennington's] yelling and finger pointing, that she [Pennington] gives me too much stuff to

copy, and that she [Pennington] never gives the other EAs that much."  *Response*, Ex. 1, ¶ 7.

Similarly, the plaintiff states that on February 26, 2007, she complained to Assistant Principal

Kathy Nelson "of harassment and of being subject to different terms of employment."

*Complaint*, ¶ 30.  In her affidavit, however, the plaintiff specified that her dealings with Nelson

at that time concerned the fact that "my caseload and daily duties were often changed in an

abrupt manner, and became too heavy to the extent that violated students' need for transition and

for individual support. . . ."  *Response*, Ex. 1, ¶ 6.  This evidence, however, shows that the

plaintiff's complaints to Pennington and Nelson were personal grievances, not concerning

18

discriminatory practices, and do not rise to the level of protected activity.  Any perceived

retaliation resulting from these complaints to Pennington and Nelson does not constitute

retaliation within the meaning of Title VII.

The plaintiff next alleges that on February 21, 2007, she asserted harassment charges, and

that she filed another "retaliation complaint" on March 29, 2007.  The record does not contain

any evidence that the plaintiff asserted harassment charges on February 21, 2007, and the

Complaint's unverified allegation does not constitute evidence of the charge.  The record shows

that the plaintiff submitted an informal grievance to Mr. Getchell on March 2, 2007, *Response*,

Ex. 3, and that she submitted another informal grievance to Ms. Nelson and Mr. Getchell on

April 3, 2007.  Id. at Ex. 4.  However, these grievances do not oppose behaviors prohibited by

Title VII.  Rather, they contain general complaints of being "scrutinized," "harassed,"

"intimidated," and subjected to "unfairness."  "There is nothing on the face of the document[s] to

alert the reader that discrimination is being alleged."  Allen, 928 F.2d at 985.  Therefore,

complaints of retaliation resulting from these grievances are not actionable.

The record shows that the plaintiff's first complaint of discrimination was made to

Debbie McGee on April 2, 2007. [6]  *Motion*, Ex. B, ¶ 2.  The record further shows that the

plaintiff complained of discrimination, retaliation, and harassment in violation of Title VII in

letters to Getchell and McGee on or about April 7, 2007.  *Response*, Exs. 5 and 6.

---

[6]According to McGee, the plaintiff complained that she was "being discriminated against and harassed by several staff members."  *Motion*, Ex. B, ¶ 2; Ex. B-7, p. 1.  Although McGee does not state that the plaintiff complained of conduct based on race or religion, McGee investigated for harassment based on "race, color,  religion, national origin, ancestry, sex, age, disability, or protected activity."  Id.

The plaintiff alleges that the following retaliatory behavior occurred after her complaint of discrimination on April 2, 2007: (1) the plaintiff was "falsely accused of placing a rope around a child's mid section" on April 5, 2007; (2) McGee threatened her; (3) she was fired on May 11, 2007; and (4) DCSD retaliated against her children and used them to relay threatening and intimidating messages to the plaintiff.

Tanya Pennington is the individual who accused the plaintiff of placing a rope around a child. *Response*, Ex. 1, ¶ 20 and Ex. 6. However, there is no evidence from which to draw a reasonable inference that Pennington was aware of the plaintiff's complaint of discrimination to McGee and that Pennington's actions were, therefore, causally connected to the protected activity. Williams v. Rice, 983 F.2d 177, 181 (10th Cir. 1993) (stating that to establish a causal connection, the plaintiff must show that the individual who took adverse action against her knew of her protected activity).

As to McGee's alleged threats, the plaintiff states:

> a) I met with McGee about the first week of April. She denied my request for administrative transfer. When I stated my belief that DCSD is retaliating against me, just like CP did, She said that I shouldn't say that or I'd look bad, and that they can terminate me for performance issue. I said but what they have on me can't terminate me, right? She replied what they have on you so far can't terminate you. I said I am Ok then? She said they can terminate you for performance deficits. I said that they wouldn't find anything, and that I work really hard. She said they will have to work harder to find performance deficit so that they can terminate you. After I looked stunned or said excuse me, she said that if what they have on me isn't enough, they will need to work harder then to find, and to document performance deficits.
> b) When I later ran into McGee at Wilcox's building and told her that I was there to get transfer forms, she asked where I was trying to transfer to. I said several posting and gave examples. She said that won't happen. I tried to end the conversation, and said hope to transfer soon, have a good day. She said I hope you will have a

> better day somehow, but that will not happen.  I briefly froze, but
> then left[.]

*Response*, Ex. 1, ¶ 22 (emphasis omitted).  The plaintiff testified that these comments were made while she was complaining of discrimination and harassment to McGee.  *Motion*, Ex. H, 33:10-34:18.

This testimony alleges insufficient facts to make any conclusions regarding a "transfer." The record does not show whether the plaintiff asked for and was denied a transfer before or after she complained of discrimination; whether she was qualified for a transfer; or whether a transfer was even available.

Viewing McGee's statements about termination in the light most favorable to the plaintiff, the plaintiff attests that after she complained about discriminatory behavior, McGee told her that she should not complain or DCSD would find performance deficits and use them as the basis to terminate her employment.  Under the rule of Wells v. Colorado Dept. of Transportation, 325 F.3d 1205 (10th Cir. 2003), McGee's statements do not constitute an adverse employment action.  Specifically, in Wells the circuit court held that a direct supervisor's threat to transfer an employee was not in itself evidence of an adverse employment action because the supervisor did not have authority to transfer the employee.  Id. at 1209, 1214.  Similarly, there is no evidence here that McGee had the authority to terminate the plaintiff's employment.  To the contrary, the record shows that Getchell, and not McGee, held the authority to terminate plaintiff's employment.  *Motion*, Ex. A-3, p.6.

The plaintiff has failed to substantiate with any competent evidence her allegations that DCSD retaliated against her children or used them to relay threatening and intimidating messages after she made her complaint of discrimination.  The only evidence of actions

involving the plaintiff's children after her complaint on April 2, 2007, is that DCSD sent her disabled child, D, to the emergency room on June 21, 2007.  *Response*, Ex. 1, ¶ 25.  D was diagnosed with an allergic reaction in both eyes.  Id. at Ex. 37.  The plaintiff attests that she "learned from [her] conversation with the Doctor, and from medical sources, which [she] reviewed later, that an allergy attack couldn't have resulted in symptoms, which are that severe and which are local only to the eyes, except if an object was rubbed into D's eyes either forcefully or for prolonged time."  Ex. 1, ¶ 25.  This caused the plaintiff to believe that "DCSD didn't supervise D until she injured herself, in retaliation to my EEOC charge." Id.  The plaintiff does not provide any facts, however, concerning who was responsible for supervising D at the time, or any facts from which a reasonable inference could be drawn that a causal connection exists between the plaintiff's complaints of discrimination and her child's diagnosis of an allergic reaction.  She relies only on her unreasonable conclusion that her child's allergic reaction was the result of retaliation.

The plaintiff received a performance evaluation rating her as "Meets Expectations" on February 28, 2006.  *Motion*, Ex. A, ¶ 2 and attachment A-1, pp. 6-7.  She was placed on a performance improvement plan on March 1, 2007.  Id. at attachment A-5.  Both events occurred prior to the plaintiff's earliest protected activity on April 2, 2007.  Consequently, imposition of the performance improvement plan cannot constitute an adverse employment action.

The plaintiff was reevaluated on May 11, 2007.  Getchell rated her as "Does Not Meet Expectations."  Id. at attachment A-6.  On the same day, Getchell informed the plaintiff that her employment was terminated.  Id. at attachment A-7.  These events took place approximately one month after she complained of discrimination to McGee and after she wrote letters to McGee and

Getchell complaining of discrimination in violation of Title VII.  *Response*, Exs. 5 and 6.  This evidence is sufficient to establish a *prima facie* case of retaliation, and the burden shifts to the defendants to produce a legitimate, nondiscriminatory justification for these actions.

The defendants assert that the performance issues that led to the plaintiff's termination were identified in her first performance review; problems with the performance issues were subsequently observed and documented; the plaintiff was placed on a performance improvement plan; she failed to improve her job performance and address the concerns raised by her supervisors; and she was terminated for her failure to improve her performance.  *Motion*, p. 12.

The record supports the defendants' assertions.  As stated, the plaintiff's first complaint of discrimination occurred on April 2, 2007.  Supra at p.19.  Prior to that, on February 28, 2006, the plaintiff received a performance evaluation from Getchell that rated her as exceeding expectations in seven areas and as meeting expectations in six areas.  Id. at Ex. A, ¶ 2 and attachment A-1.  The evaluation established the following goals for the plaintiff: develop a positive relationship with her coworkers and work collaboratively with the SSN team; be flexible and realize that interruptions and changes of plans always occur; and follow through with additional requests made by her supervisors.  Id. at Ex. A, ¶ 3 and attachment A-1.  Those goals were discussed with the plaintiff.  Id.

On December 5, 2006, also prior to the plaintiff's first complaint of discrimination, Getchell met with the plaintiff and Pennington to discuss an incident which occurred in a music class.  Id. at ¶ 4.  Getchell instructed the plaintiff to pay closer attention to the SSN students in class, provide appropriate intervention when necessary, and follow the classroom teachers' instructions and methods used to deal with behaviors.  Id.  Getchell also told the plaintiff that, as

a paraprofessional, her duties included tasks that do not always involve working with students, such as making copies or cleaning up after students.  Id.  Getchell provided the plaintiff with a summary of the meeting which states:

> Thank you for spending time with Tanya and me on Tuesday, December 5.  The following is a summary of what we discussed and the concerns that were brought forward.
>
> The incident that occurred during music on Friday, December 1 was discussed.  Tanya stated that you need to pay closer attention to what is going on with all the SSN students in a classroom and provide the necessary interventions.  This is your responsibility and should not be left to the classroom teacher. If you are unsure as to how to deal with a student or behavior appropriately, ask Tanya for support.
>
> When you are working with any SSN student you need to follow the methods that Tanya or Linda use to deal with behaviors and instruction.  It is especially important to follow the teacher[ 's] stated procedures when an SSN student is being hurtful to others or destroying property.
>
> As a para you are required to complete tasks within your job description.  Some don't always involve working directly with students.
>
> You stated that you understood what was being asked of you as an employee of Iron Horse Elementary School.  If you fail to comply with these directives, we will meet formally again.
>
> I appreciate your willingness to listen to the above concerns and follow through appropriately.

Id. at attachment A-2.

Between December 2006 and April 2007,[7] Getchell had several meetings with the plaintiff regarding her job performance.  Id. at ¶ 5.  He documented those meetings in memos and letters to the plaintiff.  Id.  The memos and meetings reflect the following:

1.   On January 1, 2007, Pennington spoke to the plaintiff because she had not done the assigned work with a student in the correct manner.  Id. at attachment A-3.

2.   On February 2, 2007, Pennington spoke to the plaintiff because she had brought an upset child into the classroom and disrupted the class, and she did not follow through with the assignment for the student.  Id.

3.   On February 16, 2007, a dispute occurred between the plaintiff and a coworker that was mediated by Kathy Nelson, Assistant Principal.  The plaintiff did not work cooperatively and collaboratively with an Iron Horse staff member.  Id.

4.   The plaintiff was placed on a performance improvement plan on February 22, 2007. Id.; Ex. A-5.  She was given three goals: work cooperatively and/or collaboratively with all Iron Horse staff; follow assigned schedules when working with students unless notified by the SSN teacher prior to the change; and maintain appropriate behavior as outlined by District Behavior Expectations so that the learning environment of students both in the regular educational setting and the learning lab will not be disrupted.  Id.; Ex. A-5, p. 1.  The plaintiff was warned that all of the goals must be achieved by May 11, 2007, and sustained or dismissal proceedings could occur.  Id. at Ex. A-5, p. 2.

_____

[7]Many of the meetings and events occurred before the plaintiff's first complaint of discrimination on April 2, 2007, but some occurred after that complaint.

5.   On March 9, 2007, the plaintiff met with Getchell and Kathy Nelson to discuss specific areas of concern regarding behavior expectations.  Id. at Ex. A-3, p. 1.  They included the following: work cooperatively with others and independently when appropriate; show sensitivity toward others; use courteous and polite language and behavior; determine the right thing to do and do it; in situations where you are unclear how to proceed, seek guidance from Linda Dunlap or Tanya Pennington first; take the initiative to help others; communicate with positive intent; communicate in an open, trusting, and truthful manner; express ideas clearly; listen actively and encourage feedback; communicate in a timely and on-going manner; and clarify communications directly with the source.

Id. at pp. 1-2.

6.   On March 14, 2007, Pennington reminded the plaintiff to put games away after their use.  Id. at p. 5.

7.   On March 30, 2007, the plaintiff received a letter pertaining to her interaction with the SSN team.  The letter addressed her inflexibility and lack of listening skills and an incident where she did not work cooperatively and collaboratively with the IHE staff.  Id.

8.   On April 4, 2007, the plaintiff was again reminded to keep her voice down in the hallway when working with students.  Id. at p. 6.

9.   On April 6, 2007, the plaintiff received a letter addressing an incident that occurred on April 5, 2007, where she placed a rope around a student's mid-section and had another student hold the two ends of the rope.  Id. at pp. 3, 6.

10.  On April 12, 2007, the plaintiff was given a letter because she left a student in the restroom unattended on April 9, 2007.  Id. at pp. 4, 6.

11.  On May 11, 2007, Getchell re-evaluated the plaintiff.  Id. at Ex. A-6.  She received a performance evaluation that rated her as meeting expectations in nine areas and not meeting expectations in four areas.  Id. at pp. 4-6.

12.  As a result of the plaintiff's failure to achieve and sustain the goals outlined in her improvement plan, her employment was terminated on May 11, 2007.  Id. at Ex. A-3, p. 6.

The defendants have provided a legitimate, non-discriminatory justification for rating the plaintiff as "Does Not Meet Expectations" and for terminating her employment on May 11, 2007.  The burden now shifts back to the plaintiff to provide evidence showing that the defendants' proffered reason is a pretext for discrimination.

"A plaintiff demonstrates pretext by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Jaramillo v. Colorado Judicial Dept., 427 F.3d 1303, 1308 (10th Cir. 2005) (internal quotations omitted).  There are three ways by which a plaintiff typically establishes pretext: (1) presenting evidence that defendant's stated reason for the adverse action was false; (2) presenting evidence that the defendant acted contrary to written company policy; or (3) presenting evidence that the defendant acted contrary to an unwritten policy or practice.  Kendrick v. Penske Trans. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).

The plaintiff asserts that in her conversation with McGee in the first week of April, McGee told her that DCSD would have to work harder to find performance deficits in order to terminate her employment, and that her requested transfer "won't happen."  The plaintiff states

27

that these statements are direct evidence that DCSD intentionally fabricated performance deficits to fire her. *Response*, p. 4.

There is no evidence that McGee had any authority to fire the plaintiff, however, or that anyone with that authority had any knowledge of McGee's statements.  To the contrary, on or about April 7, 2007, the plaintiff wrote a letter to Getchell and McGee complaining that her working conditions and "HR's refusal to transfer" her constituted a violation of Title VII. *Response*, Ex. 5, p. 3.  Importantly, the plaintiff did not mention McGee's alleged statements in her April 7 letter.  McGee's statements, without more, do not constitute evidence from which a reasonable factfinder could rationally infer that DCSD fabricated the subsequent performance deficits and terminated the plaintiff's employment in retaliation for complaining of discrimination.

The plaintiff next argues that DCSD did not support the stated goals in her first evaluation "by objective assessment or by any records that explain its context" and, therefore, the stated goals do not reflect any performance deficits.  *Response*, p. 5.  She also attempts to discredit many of DCSD's findings of performance deficits which occurred prior to her protected activity.  See e.g. id. at ¶¶ 15, 16, 19, 21.  Any incidents occurring before the plaintiff's first complaint of discrimination on April 2, 2007, cannot constitute adverse employment actions.

DCSD documented the following three performance deficits after the plaintiff's complaint of discrimination: (1) on April 4, 2007, the plaintiff was again reminded to keep her voice down in the hallway when working with students; (2) on April 6, 2007, the plaintiff received a letter addressing an incident that occurred on April 5, 2007, where she placed a rope around a student's mid-section and had another student hold the two ends of the rope; and (3) on

April 12, 2007, the plaintiff was given a letter because she left a student in the restroom unattended on April 9, 2007.  It is these actions and the plaintiff's termination that are relevant to the issue of retaliation.

The plaintiff does not address the April 4th incident.

With respect to the rope incident on April 5, 2007, the plaintiff asserts that DCSD viciously distorted her conduct because she did not place a rope around a student's mid-section. *Response*, ¶ 17 and Ex. 1, ¶ 20.  Getchell's letter to the plaintiff about this incident states that "[i]t was observed by another SSN para that you placed a rope around a student's midsection and had another student hold the two ends of the rope."  *Motion*, Ex. A-3, p. 3.  The plaintiff's denial that she placed a rope around the student's mid-section does not demonstrate that Getchell's reliance on another employee's description of the incident was a pretext for retaliation.  She does not present any evidence to show that Getchell was aware of other evidence of the incident that would render his decision implausible.

The plaintiff challenges DCSD's documentation regarding leaving a student in the restroom unattended on April 9, 2007, by stating that DCSD's records establish that she left the student in the care of other EAs.  *Response*, p. 8, ¶ 18.  She cites to defendants' Exhibit B-1, p. 7. However, this exhibit establishes that the other paraprofessionals reported that the plaintiff rushed out of the restroom and made a comment about M being in the restroom.  It does not establish that the plaintiff secured the help of another EA before she left the area.  The plaintiff also cites to defendants' Exhibit A-3, p. 4.  This exhibit states that it was reported that the plaintiff left a student in the restroom unattended; the plaintiff told another EA that M was in the restroom; but that the plaintiff left the area before the other EA had time to respond.   These

exhibits do not establish that DCSD's documentation of this event was a pretext for discrimination.  To the contrary, they support DCSD's justification for documenting the incident as a performance deficit.

The plaintiff has failed to show that DCSD's documentation of the performance deficits after her complaint of discrimination and the termination of her employment were pretext for retaliation.  Therefore, I respectfully RECOMMEND that the Motion be GRANTED insofar as it seeks summary judgment on the allegations of retaliation contained in Claim Two.

### 2.   Claims Five and Six

Claim Five alleges that as of December 6, 2006, and after filing grievances, DCSD gave the plaintiff a negative performance evaluation.  *Complaint*, p. 7, ¶ 28.  The plaintiff's negative performance evaluations are discussed above.

Claim Six alleges that after filing grievances, DCSD responded by ignoring her complaints of work interruptions or by finding there were no work interruptions.  *Complaint*, p. 7, ¶ 30.  The plaintiff addresses work interruptions in her affidavit.  *Response*, Ex. 1, ¶¶ 3, 4 (referring to *Motion*, Ex. A-1, p. 5).

The events complained of in Claims Five and Six all occurred prior to her first complaint of discrimination on April 2, 2007.  Consequently, they cannot form the basis for a claim of retaliation.  I respectfully RECOMMEND that the Motion be GRANTED insofar as it seeks summary judgment on Claim Five and Claim Six's allegations of retaliation.

### 3.   Claim Ten

In Claim Ten, the plaintiff alleges that DCSD provided negative information and references to prospective employers in retaliation for filing a charge of discrimination against

CP. *Complaint*, p. 10, ¶¶ 42-43.  The defendants assert that the plaintiff does not have any evidence to support the claim.  *Motion*, p. 18.

In support of her claim, the plaintiff provides only conclusory allegations of wrongdoing:

> After DCSD fired me, I sought work.  Some employers said that I was considered for hire, but never got back to me, after they told me that they were going to contact CP and DCSD.  When I contacted these employers later, they didn't directly deny contacting my former employers Ex G and gave evasive and contradicting answers as to why they didn't hire me, after they said that they would, which led me to belive that DCSD and CP disclosed information , which was negative enough to cause such drastic change in thoese employers' attitude and expressed intent.

*Response*, Ex. 1, ¶ 26.  See also *Motion* Ex. C, plaintiff's response to Interrogatory No. 12; Ex. H, 42:25-45:25.

The plaintiff does not provide any specific factual allegations or other evidence to support her claim that DCSD provided negative information or references to prospective employers.   I respectfully RECOMMEND that the Motion be GRANTED insofar as it seeks summary judgment on Claim Ten's allegations of retaliation.

### F.  Hostile Environment Claim

In Claim One, the plaintiff alleges that DCSD subjected her to a hostile work environment.  Title 42, U.S.C., provides in relevant part that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1) (1994).  "Although Title VII does not explicitly mention hostile work environment, a victim of a racially hostile work environment may nevertheless bring a cause of action under Title VII."

Ford v. West, 222 F.3d 767, 775 (10th Cir. 2000) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986); Bolden v. PRC Inc., 43 F.3d 545, 550 (10th Cir.1994)).

To survive summary judgment on a hostile work environment claim, a plaintiff must meet two criteria.  First, the plaintiff must show that "'under the totality of the circumstances, the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment.'"  Trujillo v. University of Colorado Health Sciences Center, 157 F.3d 1211, 1214 (10th Cir. 1998) (quoting Bolden v. PRC Inc., 43 F.3d 545, 550 (10th Cir.1994) citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986)).  The court must look at all circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id.  Second, the plaintiff must show that "'the harassment was racial or stemmed from racial animus.'"  Id. (quoting Bolden v. PRC Inc., 43 F.3d 545, 550 (10th Cir.1994) citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986)).

In addition, the record must support a basis for employer liability.  Ford v. West, 222 F.3d 767, 775 (10th Cir. 2000).  The circuit court has "identified three bases, drawn from general agency principles, for holding an employer liable for hostile work environment based on a supervisor's or co-workers' racial harassment: (1) where the conduct occurred within the transgressor's scope of employment, (2) where the employer knew, or should have known, about

the violation and failed to respond in a reasonable manner, or (3) where the transgressor acted with apparent authority or was aided by the agency relation."[8]  Id. at 775-76.

In her Complaint, the plaintiff alleges that she was "harassed with threatening and offensive comments relative to my ex husband's title VII lawsuit, to my charge against CP, to my national origin, race and religion and to discharge of student loan" and that the harassment had been occurring "[e]ver since I was hired by DCSD."  *Complaint*, ¶ 13.  She further alleges that the harassment intensified when Nelson took over as Assistant Principal in June 2006 and "repeatedly implied that I needed to find another job, threatened me of failure, and denied me privilege of employment such as training and in-services."  Id. at ¶ 14.  The plaintiff alleges that after Pennington became her supervisor, the harassment "became extremely severe and pervasive."  Id.  She was assigned a heavier workload and duties that are not customarily performed by an EA.  Id.  She alleges that her child, Dina, was often told in the presence of the plaintiff to "tell your Mamma to go to Egypt" and "to go Home."  Id. at ¶ 15.  Comments were made about the plaintiff's Egyptian descent, and she was harassed because of her "perceived religion."  Id. at ¶¶ 15-16.  These statements are contained in the Complaint but are not verified and, therefore, are not admissible.  Consequently, I must look to the record to determine if it contains any admissible evidence of a hostile environment.

During her deposition, the plaintiff was asked who was harassing her about her religion:

A:  Every person I worked with.

Q:  How were they harassing you about religion?

---

[8]A claim for hostile environment under section 1981 is analyzed using the same criteria as a claim for hostile environment under Title VII.  Witt v. Toadway Exp., 136 F.3d 1424, 1432 (10th Cir. 1998).

       A:   Constant questions about my ex-husband's religion: Was he a Muslim?  Why was I married to a Muslim?  What is my religion?  Why don't I go to church?  Do I take my kids to church?  And the like.

*Motion*, Ex. H, 11:6-15.

This testimony is too vague to support a claim for hostile environment.

I have reviewed the plaintiff's responses to the defendants' interrogatories for evidence of harassing comments.  The plaintiff's answer to Interrogatory No. 2, although filled with conclusory allegations, contains some factual statements relevant to the plaintiff's hostile environment claim:

- As for harasssments related to my ex-husband title VII: ongoing violations from date of hire to date of termination, including, but not limited to, repeated questions about his religion, why did I marry a Muslim, his title VII lawsuit.

- As for harassments related to my charge against CP: on going violations from the date of hire to date of termination: constant comments related to CP, including but not limited to, stating I cant  work in education because I sued CP, justifying their refusal to work with me by what happened at CP, making specific comments which imply that they knew the content of my CP charge, such as commenting on my charges that CP didn't give me equal pay, or commenting on my complaint that I was harassed because of Islam.

- Harassment because of national origin was ongoing violations, include but not limited to: the one by Joyce Simon, implying that I am crazy to not speak Egyptian, not to think about my self as Egyptian and not to go back to Egypt.  The comments by Margaret Schaffer and Ann Dickeman implying that America is being too kind to people like me and that I am not born in America, that I shouldn't have the same rights like American and that Ann's father was born in Greece and that he was aware of that and never claimed the same rights like other Americans the way I do.  Sam Gates, Tanya Pennington

constant yelling out at Dina, "take your mamma and GO home" "tell your mamma to go home".  Sam Gates Asking me what is the Arabic word for Mother, when I said "mamma" they insisted in teaching Dina to call me "mamma" although I have explained that because of her disability, she cant  generalize and she cant use two names for one person or two epithets that mean the same thing and since we have been working on having her call me mommy since she was born, teaching her to call me Mamma, will cause her to stop using both words.  Constantly yelling at me to "Go home" in a way that is out of the social context and norms of the situation.

- More example of the harassment related to national origin, religion and race.  Constant harassing comments, including, but not limited to constant mockery at my accent.  Constant comments about my look and my skin color, my eating habits, my dressing style, the language I speak at home.  My religion.  Even when I said that I am no longer Muslim, they kept on stating that I am only saying this to keep my job and constantly harassed me with comments about why don't I take my kids to church and what is really my religion.  There was one incident, which I will never forget, because it involved violation of the non-religious nature of the public schools by providing religious instruction to a student, when Ann Dickeman asked me if I am really Christian why don't I go to church and when I deviated from answering, she made a child "Pantelis" draw a cross and hang it by the wall of the class room, visible to administrator, and kept on teaching him the significance of the Greek cross and constantly redirecting him to listen to her, as I was trying to start working with him.  Also, Tanya's comment that I need to remember my size and remember where I came from.

- As for discharge of student loans: ongoing comments: including but not limited to, comments stating that people in this county become homeless when they discharge student loans, such as Margaret and Ann Dickeman comments that I shouldn't have the same equal protection of the law by filing bankruptcy and discharging my debts, that people, like me, come here from other countries, accumulate these debts, discharge them as if they have the same rights to other native citizens.  Most of the

> harassment related to the discharge of student loans reflect
> discrimination on national origin, as most of the comments
> imply that they thought that I am not eligible to discharge
> my debts because I am not born an American and that is
> why although the student loans discharge might not be a
> protected activity under title VII, the harassment related to
> it is still a protected activity[.]

*Motion*, Ex. C, plaintiff's response to Interrogatory No. 2.

The plaintiff's responses to the defendants' interrogatories are not sworn. Therefore, they are not admissible evidence. As discussed below, even if the responses were admissible, they do not establish a hostile environment.

I also have reviewed the plaintiff's affidavit for evidence of harassing comments.[9] Like the plaintiff's responses to the defendants' interrogatories, the affidavit contains many conclusory allegations of harassing comments and many allegations of comments that cannot be construed as racially or religiously based. *Response*, Ex. 2. The affidavit does not contain any additional statements that reasonably can be construed as supporting a claim for harassment based on national origin, race, or religion.

The plaintiff's allegations of harassment from unidentified individuals at unspecified times are vague and conclusory. They include allegations of "harasssments" stemming from her ex-husband's law suit and her charge against CP; the "constant mockery" of her accent; the "constant comments" about her looks, skin, color, eating habits, and language; and inquiries about her religion and why she does not take her children to church. "Conclusory allegations that are unsubstantiated do not create an issue of fact and are insufficient to oppose summary

---

[9]I use the interrogatory responses as the basis for my analysis because the affidavit's allegations are not presented in any organized fashion.

judgment." <u>Harvey Barnett, Inc. v. Shidler</u>, 338 F.3d 1125, 1136 (10th Cir.2003) (quotations omitted). <u>See</u> also <u>Ford</u>, 222 F.3d at 777 (affirming summary judgment in a Title VII hostile environment case where plaintiff's claims were "vague and conclusory, without reference to specific dates or circumstances").

    The plaintiff's more specific allegations of harassment cannot reasonably be construed as stemming from racial or religious animus. The allegations that fall into this category include Simon's comments "implying" that the plaintiff is crazy not to speak Egyptian or think of herself as Egyptian; Gates' and Pennington's comments about "take your mamma home"; and Gates' conversation about the Arabic word for mother.

    The following allegations can be construed as racially or religiously based: Schaffer and Dickeman's comments that the plaintiff should not have the same rights as an American; Dickeman's actions regarding the cross; and Margaret and Ann Dickeman's comments that the plaintiff should not have the right to use the bankruptcy laws because she is not a native citizen. However, there is no evidence to establish that these alleged actions and comments were pervasive or sufficiently severe to alter the terms, conditions, or privileges of the plaintiff's employment. A racially hostile environment must be both objectively and subjectively offensive--"one that a reasonable person would find hostile or abusive." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787 (1998). Title VII does not protect against the ordinary tribulations of the workplace. <u>Id.</u> at 788 (citations omitted). Rather, the "conduct must be extreme to amount to a change in the terms and conditions of employment." <u>Id.</u> In addition, the plaintiff does not provide any evidence tending to establish that DCSD may be held responsible for these actions and comments. There is no evidence to show that Schaffer, Dickeman, or

"Margaret" were supervisory employees, nor is there any evidence demonstrating that DCSD

knew of or should have known of the alleged comments and actions.  See Faragher, 524 U.S. at

807 (holding that an employer is subject to vicarious liability for a hostile environment created

by a supervisor with immediate or higher authority over the employee); Ford, 222 F.3d at 776

(holding that a plaintiff must establish that the employer had actual or constructive knowledge of

a hostile environment created by coworkers).

I respectfully RECOMMEND that the Motion be GRANTED insofar as it seeks summary

judgment on the plaintiff's hostile environment claim.

### G.  Disparate Treatment

The plaintiff alleges that DCSD discriminated against her on the basis of her race,

national origin, and religion when it denied her job opportunities (Claim Three); subjected her to

different terms and conditions of employment (Claim Four); gave her a negative performance

evaluation (Claim Five); denied her "due process to grievance" (Claim Six); terminated her

employment (Claim Seven); and refused to compensate her for additional duties assigned to her

as of June 2005 (Claim Nine).  The plaintiff alleges that the Board of Education discriminated

against her when it endorsed her termination without due process (Claim Twelve).

The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.

To do so, she must demonstrate "(1) membership in a protected class, (2) adverse employment

action, and (3) disparate treatment among similarly situated employees."  Orr v. City of

Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005).  If the plaintiff is successful, under

McDonnell Douglas the burden shifts to the defendants to demonstrate a legitimate non-

discriminatory reason for the adverse employment actions.  Id.  If the defendants meet their

burden, the burden shifts back to the plaintiff to show that the defendants' proffered reasons are pretext.[10]  Id.

The defendants assert that the plaintiff cannot establish her *prima facie* case because she cannot show that she was treated less favorably than other similarly situated employees.  *Motion*, p. 11.  Indeed, with the exception of the plaintiff's allegations that she was subjected to "different terms and conditions of employment," the record does not contain any competent evidence from which a reasonable inference may be drawn that the alleged adverse actions constituted less favorable treatment.  See e.g. *Motion*, Ex. C; *Response*, Ex. 1.

The plaintiff states that Pennington subjected her "to different terms and conditions of employment: assigning me duties which she didn't assign other paras, like clearing the cafeteria, excessive copying of books, requiring me to clean without gloves."  *Motion*, Ex. C, p. 5, response to the defendants' Interrogatory No. 8.  In addition, she attests that Pennington assigned her to four students and she is "the only EA who is given heavier caseload and excessive copying." *Response*, Ex. 1, ¶ 9.  The record does not contain any further evidence regarding the assignment of additional duties.

The circuit court stated in Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (10th Cir. 1998):

> The Tenth Circuit liberally defines the phrase "adverse employment action."  See Gunnell v. Utah Valley State College, 152 F.3d 1253, 1264 (10th Cir.1998); Jeffries v. Kansas, 147 F.3d 1220, 1232 (10th Cir.1998).  Such actions are not simply limited to monetary losses in the form of wages or benefits.  See Berry v.

---

[10]The plaintiff's claims under 42 U.S.C. § 1981 are also analyzed pursuant to the McDonnell Douglas framework.  Kendrick v. Penske Transp. Services, Inc., 220 F.3d 1220, 1226, n.4 (10th Cir. 2000).

> Stevinson Chevrolet, 74 F.3d 980, 986- 87 (10th Cir.1996).
> Instead, we take "a case-by-case approach," examining the unique
> factors relevant to the situation at hand. Jeffries, 147 F.3d at 1232.
> Nevertheless, we will not consider "a mere inconvenience or an
> alteration of job responsibilities" to be an adverse employment
> action. Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132,
> 136 (7th Cir.1993); see also Burlington Indus., Inc. v. Ellerth, 524
> U.S. 742, ----, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998)
> (conduct is adverse employment action if it "constitutes a
> significant change in employment status, such as hiring, firing,
> failing to promote, reassignment with significantly different
> responsibilities, or a decision causing a significant change in
> benefits"); Spring v. Sheboygan Area Sch. Dist., 865 F.2d 883, 886
> (7th Cir.1989) (principal's change in assignment was not an
> adverse employment action despite her increased commute and
> belief that the public perceived the transfer "as a 'nudge towards
> retirement' ").

The plaintiff's allegations that Pennington assigned different or additional duties does not, without more, constitute an adverse employment action within the meaning of Title VII. I respectfully RECOMMEND that the Motion be GRANTED insofar as it seeks summary judgment on the plaintiff's claims for disparate treatment.

## IV. CONCLUSION

I respectfully RECOMMEND that the Motion be GRANTED insofar as it seeks dismissal of the plaintiff's state law tort claims for lack of subject matter jurisdiction.

I further RECOMMEND that the Motion be GRANTED and that summary judgment enter in favor of defendants Douglas County School District and Douglas County School Board of Education on all of the remaining claims against them.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have 10 days after service of this recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections

waives *de novo* review of the recommendation by the district judge, Fed.R.Civ.P. 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.  <u>In re Key Energy Resources Inc.</u>, 230 F.3d 1197, 1199-1200 (10th Cir. 2000).  A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.  <u>United States v. One Parcel of Real Property</u>, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated August 10, 2009.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge